Argued and submitted November 20, 1989, reversed and remanded for further
proceedings April 25, 1990

# MILLER,
*Respondent,*

*v.*

# MILLER,
*Appellant.*

## (850403; CA A49016)

790 P2d 1184

Michael J. Morris, Portland, argued the cause and filed the briefs for appellant.

J. Christopher Minor, Newport, argued the cause and filed the brief for respondent.

Before Graber, Presiding Judge, and Joseph, Chief Judge, and Edmonds, Judge.

## GRABER, P. J.

This is an action by Mike Miller (Mike) to partition land (the ranch) that he and Tim Miller (Tim), his brother, had purchased as tenants in common. The trial court found that Mike and Tim each owned an undivided half interest in the ranch and partitioned it in kind. Tim appeals. On *de novo* review, ORS 19.125(3), we generally agree with the trial court's decision. However, we find that Tim is entitled to interest on the portion of the purchase price that he paid on Mike's behalf. We therefore remand for a recalculation of the equitable adjustment in Tim's favor.

The ranch consists of approximately 60 acres on the inside of a sharp bend in the Siletz river, several miles north of the city of Siletz. Tim's and Mike's father first leased it during the early years of this century, and both of them were born there. Members of the family continued to lease it after their father died in 1935. They could not buy the ranch, because the federal government held it in trust for members of the Siletz tribe. In the early 1940s, Mike lived on the ranch and used it, together with land that he had bought directly to the east, to raise cattle. Around 1945, Mike moved onto the land to the east. In 1949, Tim and his wife moved into the house on the ranch. They made major improvements to the house[1] but did not at first use the ranch land, except possibly for a milk cow or two. Tim's primary occupation was lumbering, and Mike continued to run cattle on the ranch.

In 1950, the government patented the ranch to the lessors, who had promised to sell it to the Miller family when they received the patent. In October, 1950, Mike and Tim together entered into a contract to buy the ranch for $10,000. Each made an initial payment of $3,000. During the previous year, Mike had given the sellers $600; thereafter, he gave one of them $300 by checks marked "payment on place." He testified that all of the money was intended as part of the purchase price, but the parties did not credit any of it toward either the

---

[1] Tim's wife described the house when she moved into it:

"We moved into a three bedroom, large kitchen, small living room house. And it was completely unfinished upstairs. There was no flooring. There was cold running water. A wood stove. A fireplace. The outhouse was across the road and it was leaning backwards. Does that give you a picture of the house?"

initial payment or the remaining balance. The contract called for payment of the balance in two years. At the request of one of the sellers, Tim paid the outstanding $4000, plus accrued interest, in November, 1951, which was a year early.[2]

■ During the 1950s, Mike used all of the ranch, except Tim's homestead, to pasture cattle and to raise hay. Toward the end of the decade, Tim began running his own cattle on the ranch; his herd gradually grew, until by the mid-1960s there was no room for Mike's cattle. Mike last took hay from the ranch in 1966 or 1967;[3] thereafter, except for occasional strays that came through broken fences, Tim alone used all of it. In the early 1950s, Mike located water rights at two sites on the Siletz river adjacent to the ranch. He buried pipes across the ranch land to carry the water to his land to the east. Mike last used those water rights in the 1970s.

In 1949, Tim conveyed to Mike 10 acres across the road from the property that Mike had bought (lot 39). According to Mike, Tim did so in appreciation for the hospitality that Mike and his wife had shown him over a number of years. Tim, on the other hand, testified that he was intending to go to Guatemala to cruise timber. He was not sure whether he would return safely and, at the suggestion of two lawyers, gave Mike the deed to lot 39 for safekeeping. Tim testified that he intended Mike to own the property only if he did not come back from Guatemala. In fact, Tim did not go to Guatemala. Instead, soon after the conveyance, he married and moved onto the ranch. He did not ask Mike to reconvey the property until many years later, but he asserts that in the early 1950s he seeded it with grass and paid for building an equipment shed on it.

---

[2] This is one of the many aspects of this case in which the passage of time has dimmed everyone's recollection, so it is impossible to say for certain what happened. If Mike is correct, the sellers received $900 more than the agreed price, and Tim paid 64.22% of the principal. If, as is most likely, only the checks written after the execution of the contract were applied to it, the sellers received an overpayment of $300, and Tim paid 67.96% of the principal. If none of the checks applied to the contract, the sellers received the correct amount, and Tim paid 70% of the principal. Tim suggests that the checks were credited to Mike's portion of the initial payment, but we accept Mike's testimony that he borrowed the full $3,000 from a bank.

[3] Mike testified that he last took hay from the ranch "around '67, near as I can remember." The trial court found that he did so in 1966 or 1967. In any case, we find that it was after March, 1966. We take judicial notice that one cannot make hay in western Oregon before April. See OEC 201(f).

According to Tim, in the mid-1960s Mike suggested that they sell the ranch and other property for a proposed resort development. Tim's and Mike's families discussed the possibility and decided not to sell, but the discussions led Tim and Mike to clear up some loose ends of their property relationship. They agreed that Mike would retain lot 39 free of any claim by Tim and that, in return, Tim would receive Mike's interest in the ranch. Mike, on the other hand, denies that there was an agreement and does not remember any conversation on the subject. Even if we accept Tim's version, the words that the parties used were too uncertain for us to find that they reached the agreement that he describes. Tim's recognition during later negotiations that Mike had a continuing ownership interest also suggests that there was no agreement at that time.

Mike and Tim next tried to resolve the ranch issue in 1978. After consulting a lawyer, Mike offered to buy Tim's interest for $60,000 or to sell his to Tim for the same price. If Mike bought, Tim would keep the house; if Tim bought, Mike would receive easements for his water rights. Tim objected that Mike had only a one-third interest and that the price, therefore, was too high. Mike responded, according to Tim, that he knew that, but that the lawyers did not. Nothing related to the ranch came of that negotiation.

In 1984, Mike again insisted that he and Tim should get their affairs arranged. He offered to sell Tim his share in the ranch for $80,000. Tim had recently purchased 11 acres across the road from the ranch for $4,000 per acre, and Mike used that value as the basis for his offer. Tim, in response, offered to pay Mike $30,000 and to give up his claim to lot 39. Again they were unable to agree, and Mike filed this action.

■ Tim's first assignment is that the trial court erred in failing to find that the parties effected an oral partition of the ranch in the 1960s. We have already found that, even if we were to accept Tim's version of events, the evidence does not support an oral partition.

■ Tim next argues that the court erred in failing to find that he had adversely possessed the ranch. However, actual possession by one cotenant normally does not dispossess another cotenant. In order to prove adverse possession, the

claiming cotenant must show an ouster of the others. *Nedry v. Morgan,* 284 Or 65, 68, 584 P2d 1381 (1978); *Smith et al v. Tremaine et ux,* 221 Or 33, 36, 350 P2d 180 (1960). There is no evidence that would justify our finding that Tim ever ousted Mike.

■■      Tim also argues that he established adverse possession under the special criteria in *former* ORS 105.615:[4]

> "An action may be brought under ORS 105.605 by a tenant in common of real property to establish adverse possession as against all other cotenants if the tenant in common has been in possession of the real property, exclusive of all other cotenants, for an uninterrupted period of 20 years or more and has paid all taxes assessed against such property while in possession."

The statute requires that the claiming cotenant satisfy the requirements *in order to bring the action.*[5] Thus, the cotenant must qualify as of the date that the action is filed. In this case, Tim filed his action under ORS 105.615 on March 11, 1986, by a counterclaim in his amended answer. We have found that Mike took hay from the land after March, 1966, most probably in 1967. He did so under his right to possession as a tenant in common, and Tim, therefore, did not have exclusive possession for 20 years before he filed the action.

■      Tim next assigns as error the trial court's finding that Mike is the owner of lot 39. We need not decide the parties' arguments concerning gifts or constructive trusts, because we agree with the trial court that Mike obtained title by adverse possession. Even if Tim seeded the property and paid for the shed in the early 1950s, Mike has been in open, notorious, hostile, adverse, and exclusive possession of lot 39 since at least the mid-1960s. Tim's limited use of the equipment shed during that period is consistent with the brothers' general practice of sharing separately owned property.

■      The trial court found that Tim and Mike own equal shares in the ranch; Tim assigns error to that apportionment

---

[4] ORS 105.615 was amended by Oregon Laws 1989, chapter 1069, section 3, effective with actions filed after January 1, 1990. Or Laws 1989, ch 1069, § 4.

[5] A cotenant claiming title under ORS 105.615 does not need to prove ouster of the other cotenants. *Willson v. Hessong,* 38 Or App 269, 272, 589 P2d 1194 (1979).

and contends that he owns a two-thirds interest. The deed conveying the ranch to Mike and Tim was executed at the same time as the contract of sale, when Tim and Mike each expected to share equally in the purchase. Each made an initial down payment of $3,000 in 1950. At the outset, then, Tim and Mike intended to acquire equal shares. They did not modify their agreement to buy the property as equal owners before the deed was delivered, and the evidence does not show that Mike conveyed part of his interest to Tim after the deed was delivered. Although Tim paid the entire $4,000 balance in 1951 and thereby paid about two-thirds of the purchase price, that fact does not demonstrate a meeting of the minds to alter the ownership interests. Mike testified that he still thought that he had a claim to a one-half share. We find, therefore, that Tim and Mike own equal interests in the ranch.

■■ In November, 1951, Tim paid $2,000 of the balance that Mike should have paid. We agree with the trial court's approach of giving Tim a $2,000 credit for that payment. However, we disagree with the court's decision not to add interest, because Mike has had the benefit of the appreciation in value of the land but has not compensated Tim for the use of his money. On remand, the court should recalculate the equitable adjustment of $6,800 that it awarded to Tim as part of the partition by adding interest on the $2,000 from the date that Tim paid it.

■ Finally, Tim challenges the partition in kind, arguing in favor of a private sale. There is a statutory preference for partition in kind, ORS 105.205,[6] and we agree with the trial court that partition in kind would not produce great prejudice. The ranch is too small, either before or after partitioning, to support a profitable cattle operation by itself. Tim has supplemented it for some time with other land that he rents or owns, and he will have to continue doing so whether he retains it all or loses some of it. Partition in kind is the appropriate remedy.

---

[6] ORS 105.205 provides, in pertinent part:

"When several persons hold real property as tenants in common, in which one or more of them have an estate of inheritance, or for life or years * * * any one or more of them may maintain a suit for the partition of the real property according to the respective rights of the persons interested therein, and for a sale of all or a part of the property *if it appears that a* partition cannot be had without great prejudice to the owner." (Emphasis supplied.)

Reversed and remanded for further proceedings not inconsistent with this opinion.